AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
6/12/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: ___KM___ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
June 12, 2026
CENTRAL DISTRICT OF CALIFORNIA
BY: ___MP___ DEPUTY

United States of America

v.

Christina Mareik,
aka "Christina Marie Sanchez Hernandez",

Defendant.

Case No.   2:26-mj-03520-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

[18 U.S.C. §§ 1347, 2]

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about October 11, 2022, in Los Angeles and San Bernardino Counties and elsewhere, defendant CHRISTINA MAREIK, aka "Christina Marie Sanchez Hernandez", together with others, each aiding and abetting one another, did knowingly and willfully execute and willfully caused to be executed a scheme and artifice to defraud a health care benefit program affecting commerce, that is Medicaid of California ("Medi-Cal"), and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, by causing to be submitted a false and fraudulent claim from Monte Vista Pharmacy to Medi-Cal, namely claim number 51250479201 for beneficiary K.R. for Meloxicam 5 mg capsule, prescribed by Patricia Anderson, for which Monta Vista Pharmacy billed Medi-Cal approximately $13,424.45, in violation of 18 U.S.C. §§ 1347, 2.

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
_____
*Complainant's signature*

Elaine Wong, FBI Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 b  tele hone.

Date: ____June 12, 2026____

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon.  Anna Y. Park, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Roger Hsieh x0600

## Table of Contents

I.   INTRODUCTION............................................... 1

II.  PURPOSE OF AFFIDAVIT...................................... 1

III. SUMMARY OF PROBABLE CAUSE................................ 3

IV.  STATEMENT OF PROBABLE CAUSE.............................. 6

     A.   RELEVANT INDIVIDUALS AND ENTITIES.....................6

     B.   MAREIK'S ACTIVE ROLE IN THE MEDI-CAL FRAUD SCHEME.....7

          1. Background on the Medi-Cal Program............7

          2. The Scheme to Defraud.........................9

          3. Medi-Cal Enrollment Records and Claims Data..12

          4. Mekail's Statements..........................14

          5. Anderson's Statements........................19

          6. Email and Fax Records........................22

          7. Phone Records................................26

          8. Medi-Cal Beneficiary Interviews..............28

          9. Randall Pays MAREIK at least $279,000 Using
               Medi-Cal Fraud Scheme Proceeds.............31

V.   CONCLUSION............................................... 33

**AFFIDAVIT**

I, Elaine Wong, being duly sworn, declare and state as follows:

## I.    INTRODUCTION

1.    I am a Special Agent with the FBI and have been so employed since February 2013.  I am currently assigned to a white-collar crime squad, Los Angeles Field Office, West Covina Resident Agency, which is responsible for investigating complex financial crimes, including health care fraud.

2.    Since becoming an FBI Special Agent, I received 22 weeks of formal training at the FBI Training Academy in Quantico, Virginia, as well as additional training courses related to criminal and counterintelligence investigations.  In addition, I have received training in financial analysis and identification of fraudulent financial activity both in Quantico and elsewhere.  During my time with the FBI, I have participated in numerous investigations regarding health care fraud.  I have participated in many aspects of criminal investigations, including reviewing evidence, conducting physical surveillance, and the execution of search, arrest, and seizure warrants.  Additionally, I have interviewed witnesses and victims who had personal knowledge regarding the investigations in which I have been involved.

## II.    PURPOSE OF AFFIDAVIT

3.    This affidavit is made in support of a criminal complaint against, and an arrest warrant for, Christina Mareik also known as Christina Marie Sanchez Hernandez (hereafter,

1

"MAREIK"), for committing a violation of 18 U.S.C. §§ 1347 (health care fraud), 2 (aiding and abetting).

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

5.    I am investigating this case with other law enforcement officers, including Special Agents Jim Nguyen and Michael Barcelona with the United States Department of Health and Human Services, Office of Inspector General ("HHS-OIG"), and Special Agent Khanhvan Le with the California Department of Justice.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, the review of documents and records that were collected during this investigation, information that was obtained from interviewed witnesses, and information obtained and relayed to me by HHS-OIG Special Agents Nguyen and Barcelona, Special Agent Le, other members of the investigative team, and others as described below.

2

## III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.    MAREIK, Paul Randall ("Randall"), Kyrollos Mekail ("Mekail"), Patricia Anderson ("Anderson"), and others submitted and caused to be submitted approximately $269 million in false claims in just 11 months to Medicaid of California ("Medi-Cal") through Monte Vista Pharmacy ("Monte Vista") for expensive prescription drugs containing generic ingredients that were not medically necessary and, in many instances, not provided to the purported recipients.  The medications at issue contained cheap, generic ingredients but which were manufactured in unique dosages, combinations, or package quantities, and so were not included in the applicable maximum price lists that cap Medi-Cal reimbursements (the "non-contracted, generic drugs").  Medi-Cal normally requires prior authorization before it pays a pharmacy for dispensing non-contracted, generic drugs.  However, in February 2022, Medi-Cal announced it had temporarily suspended the prior authorization requirement, retroactive to January 2022, in an attempt to maximize access to patient care during a program transition.

7.    MAREIK played a key role in this sprawling fraud scheme by creating fraudulent prescriptions for Medi-Cal beneficiaries, directing Anderson to sign the fraudulent prescriptions understanding that Anderson had not seen the patients or otherwise determined that the medications were medically necessary, and arranging for the fraudulent prescriptions to be submitted to Monte Vista to submit claims to Medi-Cal.  MAREIK sent thousands of fraudulent prescriptions to

3

Anderson and even caused the submission of fraudulent prescriptions under her own name.  Numerous patients complained about receiving medications from Monte Vista for which they had no use and no knowledge as to why they were receiving the medications, and MAREIK would handle the patient complaints so that patients would not involve law enforcement and so that the fraud scheme could continue.  After an audit of Monte Vista by the California Department of Health Care Services ("DHCS"), MAREIK sent Mekail hundreds of fraudulent progress notes for Medi-Cal beneficiaries to help cover up the scheme.  MAREIK received hundreds of thousands of dollars in fraudulent Medi-Cal proceeds for facilitating the scheme.  MAREIK's role in the scheme is supported by text messages from her phone obtained through a search warrant, MAREIK's emails obtained through a search warrant, financial documents, interviews with multiple percipient witnesses, and other evidence.

8.    From May 2022, and continuing through April 2023, MAREIK facilitated the signing of fraudulent prescriptions that were billed to Medi-Cal for more than $269 million and in turn for which Medi-Cal paid more than $178 million for nineteen expensive, non-contracted drugs containing low-cost, generic ingredients that were not medically necessary, not provided, or both.  As charged in this complaint and described below, MAREIK caused the submission of a fraudulent claim seeking approximately $13,424.45 on or about October 11, 2022, for beneficiary K.R. In June 2024, and March 2025, respectively, Mekail and Anderson were charged by information with health care

4

fraud in connection with the Monte Vista Medi-Cal scheme.  In July 2025, Randall was charged in an indictment with wire fraud, wire fraud conspiracy, and money laundering in connection with the Monte Vista Medi-Cal scheme.[1]

9.    On or about August 20, 2024, the Honorable Maria A. Audero issued a search warrant for MAREIK's email account (see 2:24-MJ-4969), and on or about April 27, 2025, the Honorable Karen L. Stevenson issued a search warrant for the person of MAREIK and MAREIK's cellular telephone.  See 2:25-MJ-2261 (person of MAREIK), 2:25-MJ-2262 (MAREIK's cellular

---

[1] In April 2026, pursuant to a plea agreement, Randall pleaded guilty to one count of wire fraud.  United States v. Paul Randall, 2:25-cr-00576-MCS (Dkt. 62).  His sentencing is currently scheduled for August 2026.  Randall has an extensive criminal history in this District. In February 2012, Randall pleaded guilty to an information charging conspiracy to commit mail fraud for paying illegal kickbacks to obtain referrals of workers' compensation patients to Tri-City Regional Medical Center ("Tri-City") for spinal surgeries and paying a kickback of $15,000 to $20,000 per spinal surgery.  United States v. Paul Randall, 8:12-cr-00023-JLS (Dkt. 16).  MAREIK was not charged in the Tri-City case but was referenced in the information as Randall's co-conspirator "C.H." in the mail fraud conspiracy.

In the factual basis of his plea agreement, Randall admits that he and MAREIK created a company called Summit Medical Group, through which Randall and MAREIK purchased spinal surgery hardware to be used in the surgeries at Tri-City, and created invoices inflating the cost of the hardware many times over the actual purchase price and submitting the inflated invoices to Tri-City, which submitted them to insurance carriers for payment, and then paid Summit.  Id., Dkt. 4 at 10-12. MAREIK and Randall also created a company called Platinum Medical and paid kickbacks to physicians for referring workers' compensation patients for toxicology tests.  Id.  In total, MAREIK and Randall caused a loss of between $2.5 million and $7 million to the insurance carriers.  Id. at 12.  Randall has two other federal convictions in this District, and committed the Monte Vista Medi-Cal fraud scheme while on release for another federal case.  See United States v. Paul Randall, 2:25-cr-00576-MCS (Dkt. 20).

5

telephone).  In support of the search warrant application for MAREIK's person and cellular telephone, I provided an affidavit, attached hereto as **Exhibit 1**, hereby incorporated, which detailed MAREIK's participation in the health care fraud scheme. As set forth below, in addition to other evidence such as claims data, bank records, and interview reports, evidence seized pursuant to these search warrants corroborates MAREIK's participation in the Medi-Cal fraud scheme.

### IV.    STATEMENT OF PROBABLE CAUSE

10.   Based on my review of law enforcement reports and other documents, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following facts and information.

### A.    RELEVANT INDIVIDUALS AND ENTITIES

11.   MAREIK, a resident of Los Angeles County, California, worked for Randall and MHS LLC.

12.   Randall, a resident of Orange County, California, was a patient marketer.

13.   MONTE VP LLC d/b/a Monte Vista Pharmacy ("Monte Vista") was a pharmacy located in San Bernardino County, California.

14.   MHS LLC ("MHS") was a California company owned by Randall's attorney A.G.  MAREIK purported to work for MHS.

15.   Randall controlled several trust accounts under the name SOCAL Family Irrevocable Trust ("SOCAL Trust"), all of which were established for Randall's benefit.  SOCAL Trust held accounts at Wells Fargo Bank and Wells Fargo Advisors with

another individual named K.J. as the signatory (collectively, the "SOCAL Trust Accounts").

16.  Mekail, a resident of San Bernardino County, California, was the sole owner, CEO/SEC/CFO/Director, and Pharmacist-in-Charge of Monte Vista.

17.  Anderson, a resident of Los Angeles County, California, was a nurse practitioner who had an office in Calabasas, California and who worked for MHS.  Anderson controlled and was a signatory for two checking accounts at Bank of America (the "Anderson BofA Accounts").

**B.   MAREIK'S ACTIVE ROLE IN THE MEDI-CAL FRAUD SCHEME**

Background on the Medi-Cal Program

18.  Based on my training and experience, conversations with other law enforcement agents, and investigation in this matter, I understand that Medi-Cal is California's Medicaid program, a public health insurance program that provides needed health care services for low-income individuals including families with children, seniors, persons with disabilities, individuals in foster care, pregnant women, and low-income individuals with specific diseases such as tuberculosis, breast cancer, or HIV/AIDS.  Medi-Cal is administered by the State of California and the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.  Medi-Cal is financed equally by the State of California and the federal government, with the federal government's funds provided to Medi-Cal through CMS.  Medi-Cal is a "health care benefit program," as defined by 18 U.S.C.

7

§ 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f). Individuals who receive Medi-Cal benefits are referred to as Medi-Cal "recipients" or "beneficiaries."

19. Medi-Cal payments for covered prescriptions are typically made directly to the dispensing pharmacy rather than the recipient because Medi-Cal recipients routinely assign their right to payment to the pharmacy. Once a Medi-Cal recipient assigns their right to payment to a pharmacy, the pharmacy submits its bill directly to Medi-Cal for payment.

20. All health care providers, including pharmacies, must comply with all applicable statutes, regulations, and guidelines to be reimbursed by Medi-Cal. Providers have a duty to have knowledge of the relevant statutes, regulations, and guidelines regarding Medi-Cal coverage for prescriptions.

21. California Department of Health Care Services ("DHCS") contracts with third-party entities to establish and maintain a list of Maximum Allowable Ingredient Cost ("MAICs") for certain generic pharmaceutical drugs. The purpose of the program is to establish upper-limit generic drug ingredient reimbursement rates that encourage efficient purchasing while being responsive to drug pricing fluctuations.

22. "Prior authorization" refers to a requirement by health plans, including Medi-Cal at times, for patients to obtain approval for a health care service or medication before the care or medication is provided. Such a system allows the payor to evaluate whether the requested care is medically necessary and otherwise covered before the expenses are

8

incurred.  A prior authorization system is thus an important safeguard against the overprescribing of medications and, accordingly, also important for payors such as Medi-Cal to control costs.

23.  Medi-Cal has traditionally required prior authorization for an array of medications as a condition of reimbursement, including non-contracted, generic drugs. However, at the beginning of 2022, Medi-Cal temporarily suspended prior authorization requirements for most prescription medications in connection with an ongoing transformation of Medi-Cal's prescription drug program from managed care to fee-for-service, referred to as "Medi-Cal Rx."  In February 2022, Medi-Cal notified providers of the change in prior authorization requirements, which was made retroactive to January 2022.

24.  Monte Vista was a Medi-Cal provider.

The Scheme to Defraud

25.  As detailed below, there is probable cause to believe that from in or around May 2022, and continuing through April 2023, MAREIK, Randall, Mekail, Anderson, and others executed a scheme to defraud Medi-Cal by submitting fraudulent claims for reimbursement for prescription drugs that were not medically necessary, not dispensed to Medi-Cal beneficiaries, and/or were procured by illegal kickbacks.

26.  Based on my conversations with other law enforcement officers and review of documents, including Medi-Cal claims data, interview reports, texts, emails, faxes, and bank records, I understand that following Medi-Cal's suspension of prior

9

authorization requirements in February 2022, MAREIK, together with Randall, Mekail, Anderson, and others, caused Monte Vista to submit hundreds of millions of dollars in false and fraudulent claims to Medi-Cal for certain non-contracted, generic drugs, including: Chlorzoxazone 375 mg tablet; Crotan 10% lotion; DermacinRx Lidogel 2.8% gel; Diclofenac 2% solution pump; Fenoprofen 400 mg capsule; Folite tablet; Indocin 50 mg suppository; Lidocaine-Prilocaine 2.5%-2.5% cream; Lidocort 3%-0.5% cream; Lidotral 3.88% cream; Lofena 25 mg tablet; Meloxicam 5 mg capsule; Naftifine HCL 1% cream; Naproxen-Esomeprazole DR 375-20 mg tablet; Norgesic Forte 50-770-60 mg tablet; Omeprazole-Sodium Bicarbonate 20-1,680 packet; Oxiconazole Nitrate 1% cream; Synoflex 4%-5% patch, and DermacinRx Prenatrix Caplet (collectively, the "Fraud Scheme Medications").

27. The investigation uncovered that: (1) in or around May 2022, MAREIK, Randall and Mekail agreed that Randall and MAREIK would refer false and fraudulent prescriptions for the Fraud Scheme Medications to Monte Vista so that Monte Vista could submit claims to Medi-Cal for these medications, in exchange for Randall receiving approximately 40 percent of Monte Vista's profit from the fraudulent claims associated with prescriptions Randall referred; (2) in furtherance of the scheme, MAREIK created fraudulent prescriptions for the Fraud Scheme Medications using the personal identifying information of Medi-Cal beneficiaries, submitted the prescriptions to Anderson for signature, knowing that Anderson had not seen or evaluated the patient or otherwise determined the medications prescribed were

10

medically necessary, and directed Anderson to submit the fraudulent prescriptions to Monte Vista so that Monte Vista could bill Medi-Cal for the medications; (3) Randall used the fraud scheme proceeds to pay MAREIK for submitting the fraudulent prescriptions; and (4) Randall used the fraud scheme proceeds to pay kickbacks to Anderson and other prescribers to write prescriptions for the Fraud Scheme Medications.

28.  A review of Medi-Cal claims data supports that from in or around May 2022 to in or around April 2023, MAREIK, Randall, Mekail, Anderson, and others submitted and caused to be submitted over $269 million in false and fraudulent claims to Medi-Cal for purportedly dispensing the Fraud Scheme Medications, on which Medi-Cal paid at least approximately over $178 million.

29.  A review of bank records supports that between approximately May 16, 2022, and November 14, 2023, Mekail and his family members paid Randall at least approximately $32 million in fraud scheme proceeds to the SOCAL Trust Accounts.

30.  A review of bank records supports that between March 2022 and December 2023, Randall paid MAREIK at least approximately $279,000 in fraud scheme proceeds.

31.  A review of bank records supports that between February 2022, and April 2023, Randall paid and caused to be paid Anderson at least approximately $285,500 in kickbacks in exchange for prescriptions for the Fraud Scheme Medications.

11

<u>Medi-Cal Enrollment Records and Claims Data</u>

32.   Medi-Cal enrollment records show that Monte VP LLC and Mekail purchased Monte Vista on or about October 21, 2021. Medi-Cal claims data shows that in December 2021, Monte Vista billed approximately $31,341.54 and was paid approximately $10,652.20 by Medi-Cal.

33.   Medi-Cal claims records show that in or around April 2022, Monte Vista's claims to Medi-Cal jumped from tens of thousands of dollars billed per month in 2021, to tens of millions of dollars billed per month.  In April 2022, Monte Vista billed Medi-Cal approximately $712,619.42 and was paid approximately $275,729.60.  In May 2022, Monte Vista billed Medi-Cal approximately $1,650,000 and was paid approximately $867,000.  In June 2022, Monte Vista billed Medi-Cal approximately $6,410,000 and was paid approximately $4,000,800. In December 2022, Monte Vista billed Medi-Cal approximately $73,197,520.60 and was paid approximately $48,918,660.39.  Monte Vista's billed amount to Medi-Cal increased approximately $73,166,179, or about 233,447 percent, within twelve months.  I understand the chart below shows Monte Vista's increase in Medi-Cal billing from December 2021 to June 2022:

12



Monte Vista Pharmacy Medi-Cal Billed Amount and Medi-Cal Paid Amount by Service Date Year and Month

34. Medi-Cal payments for the Fraud Scheme Medications account for approximately 93 percent of Monte Vista's total revenue from May 2022 to March 2023.

35. Through my research and conversations with others, I understand that the Fraud Scheme Medications all contain cheap, generic ingredients, but were manufactured in unique or idiosyncratic dosages, combinations, or package quantities, and so were not included in the applicable maximum price lists that cap Medi-Cal reimbursements.

36. As such, the Fraud Scheme Medications typically required prior authorization from Medi-Cal before a pharmacy could be paid for dispensing those drugs. However, as discussed above, in February 2022, Medi-Cal announced it had temporarily suspended the prior authorization requirement, retroactive to

13

January 2022, in an attempt to maximize access to patient care during a program transition.

37.    For example, one of the non-contracted generic drugs billed by Monte Vista was Meloxicam 5 mg.  Through my research and conversations with others, I understand that Meloxicam is a non-steroidal, anti-inflammatory drug used to treat arthritis. Monte Vista began billing for Meloxicam 5 mg in February 2022. According to Medi-Cal claims data, when billing Medi-Cal for a 30-day supply of Meloxicam 7.5 mg tablets, Monte Vista billed approximately $124.06 and was paid $13.52.  By contrast, when billing for a 30-day supply of Meloxicam 5 mg tablets, Monte Vista billed approximately $13,424.45 and was paid $8,956.20.

Mekail's Statements[2]

38.    During proffers with law enforcement, Mekail stated the following:



- Mekail met Randall in or around March 2022, when Randall walked into Monte Vista and introduced himself as someone who could help bring business to the pharmacy.
- Randall asked Mekail to try billing a test claim for a specific medication, which was sent to Mekail by MAREIK, whom Randall identified as his office assistant, and which Mekail saw reimbursed for approximately $6,000.  After the large reimbursement, Randall asked Mekail to meet outside the pharmacy.
- Randall agreed with Mekail that Randall would provide prescriptions to Monte Vista in exchange for 40% of the Medi-Cal profits, and Randall explained that MAREIK would arrange for Monte Vista to receive prescriptions from Anderson and other prescribers that Mekail billed to Medi-Cal.
- Mekail sent MAREIK a template prescription form containing a list of the Fraud Scheme Medications, which MAREIK used to create prescription templates for Medi-Cal beneficiaries.
- MAREIK and Mekail would discuss additions of new Fraud Scheme Medications to the template.
- MAREIK would ensure the prescriptions were signed by Anderson and that Anderson submitted the signed prescriptions to Monte Vista, which Anderson did using the eFaxage platform.
- MAREIK would send Mekail a text message each day with the names of Medi-Cal beneficiaries for whom Monte Vista could expect to receive a signed prescription form from Anderson.

15

Mekail understood that MAREIK would send him the daily list of beneficiaries so that Mekail would know how much to pay Randall in kickbacks that day, per their agreement.

- Randall asked Mekail to pay him through checks to the SOCAL Trust Accounts and Mekail at times paid Randall every day.

- Based on the volume of prescriptions MAREIK promised to send Mekail each day, Mekail understood that MAREIK knew that Anderson was not seeing the patients.

- Mekail received many complaints from beneficiaries or their family members who received drugs they were not prescribed. Mekail would inform MAREIK of these complaints, and MAREIK would communicate with the beneficiaries.  After MAREIK communicated with the beneficiaries, Mekail did not receive further complaints from those beneficiaries. MAREIK was diligent about resolving matters regarding Randall's patients.

- MAREIK instructed Mekail to cancel prescriptions for certain patients, which Mekail understood to mean to not fill additional prescriptions for these patients but did not mean to reverse the billing for any of these patients.

- When there were new patients, MAREIK indicated to Mekail which medication she wanted included on the patients' prescriptions.  Mekail understood that it was MAREIK, and not Anderson, who was filling out the medication on the prescription forms.  MAREIK always included Lidocourt, Lidogel, and Lidostral on the prescription forms.

16

- Following the DHCS audit of Monte Vista in the fall of 2022, Mekail learned from another co-conspirator that he needed progress notes from a medical provider to substantiate the fraudulent prescriptions, and made this request of Randall.  Shortly thereafter, MAREIK emailed and/or faxed Mekail hundreds of progress notes for Medi-Cal beneficiaries purportedly written and signed by Anderson. After reviewing the notes, Mekail noted that the entries for the patients' "history and diagnosis" and "treatment rationale" were all similar except for the patient's name and information at the top.  Mekail identified the handwriting on the progress notes as consistent with MERAIK's handwriting.  Mekail provided the government with electronic versions of the progress notes, an example of which is shown below:

To: Monte Vista Pharmacy Montclair        Page 08 of 26        2023-01-31 09:32:58 GMT        13109353376        From: NHS Medical Associates

Date: 9/8/22

Please send the pharmacy the following information with your prescription.

All information on this form must be filled out. Prescriber's signature must be signed using ballpoint pen, no stamp signature will be accepted

Physician Name and Address: Patricia Anderson FNP
Calabasas CA 91302

Patient's Name:

Date(s) of Service: 9/8/22

Patient's Address:

Name of medication(s): Topicals: Lidocort, Lidogel, Lidotral, Lidore, Folite, Meloxicam, Bicarb

Patient's History and Diagnosis:

M62.83, M25.50, E46I, K21.9, M25.511, M54.51

Treatment Rationale: (include information on the treatment up to this point, course of care and why the medication is necessary and how you expect that it will help the patient.)

M62.83, M25.50, pt used OTC Medicine causing stomach pain/dizziness E46I, pt used OTC Vitamins increased nausea & dizziness No Relief, K21.9. Pt used OTC medicine causing gas bloating no Relief, M25.511, M54.51. pt used OTC ointments Swelling/blistering occurred No Relief

PHYSICIAN NAME: Patricia Anderson, FNP NPI:        CP#

Patricia Anderson FNP

- Beginning in early to mid-January 2023, Mekail began receiving larger volume of Medi-Cal prescriptions, and due to the large volume, he could not fill all of the prescriptions. MAREIK frequently contacted Mekail during this time to check on the status of Mekail filling these prescriptions. MAREIK asked Mekail whether he had backdated the prescriptions, which Mekail understood to mean MAREIK knew the temporary suspension of the pre-authorization requirement was going to end soon.

18

Anderson's[3] Statements

39. As stated above, Anderson was the top prescriber of the Fraud Scheme Medications for Monte Vista.

40. DHCS's review of the prescription records pulled during the onsite visit showed that all of Anderson's prescription records were either facsimile templates or telephone prescriptions.

41. During proffers with law enforcement, Anderson stated the following:



19

- Anderson met Randall in 2019 or 2020 through a colleague who used to work for Randall's company, MHS, and the two met at a restaurant to discuss Anderson working for MHS.

- The agreement with Randall was that Anderson would be paid to sign prescriptions for MHS.  During a dinner meeting, Randall showed Anderson versions of the spreadsheets with patient names and the Fraud Scheme Medications.[4]

- Prior to signing prescriptions for Monte Vista, Anderson worked with Randall and MAREIK for at least three other pharmacies where she signed prescriptions for patients she had not seen or otherwise determined the medication was medically necessary.

- Beginning in 2022, Anderson began signing prescriptions for Monte Vista on behalf of MHS.  Some of the prescriptions were for pain cream as well as folite tablets and naproxen.  Anderson met with Mekail and Randall for dinner on at least two occasions to discuss the prescriptions.  Anderson understood that MAREIK would send Anderson prescriptions to sign daily.  Randall told Anderson that these prescriptions were refills.

- Anderson admitted that she would sign the prescription forms MAREIK sent her without seeing or contacting the patient, and without reviewing any of the patients' medical records.

---

[4] A version of this spreadsheet was later found in Randall's Tesla during execution of a search warrant at his home in November 2023.

20

- MAREIK would often email Anderson up to 10 prescription forms in the evening and would follow up with Anderson via text message the following morning if the prescriptions were not signed and submitted to Monte Vista quickly enough.  Based on the volume of prescriptions MAREIK sent and her expectation that they be submitted to Monte Vista immediately, Anderson understood that MAREIK knew Anderson was not seeing any of the patients or otherwise determining that the prescriptions were medically necessary.

- Anderson would e-fax the prescriptions to Monte Vista using the FAXAGE platform.

- When shown the progress notes purportedly written by Anderson and sent to Mekail, Anderson stated that the handwriting was not hers, that she had never seen the progress notes before, and that she had never written any progress notes for Monte Vista patients.  When asked about the fax number at the top of the progress note, documented as (310) 935-3376, Anderson confirmed that it was the same number she had in her phone under the contact "Randall-MHS fax".

42.  Anderson also provided the government with an unsigned version of a contract between her and MHS, which she received from Randall.  The contract, dated June 1, 2022, provides that MHS was to pay Anderson a monthly fee of $25,000 for various duties and responsibilities, including for Anderson to "see patients as a Provider in outpatient . . . practice" and provide "health care management, disease prevention and health promotion

21

for her patient base as well as follow up visits." The signatories on the contract are Anderson and A.G., who is listed as the "founder" of MHS, however, it was unsigned by A.G. Anderson confirmed that she never performed any of the duties in the contract and was paid only for the prescriptions. Accordingly, the evidence shows that the contract between Anderson and MHS was intended as a sham agreement to cover up the kickbacks paid to Anderson.

Email and Fax Records

43. I reviewed emails obtained pursuant to a search warrant of MAREIK's Gmail account, which was seized by law enforcement on or around August 20, 2024, pursuant to a search warrant mentioned in paragraph 9, supra. I also reviewed emails obtained pursuant to a search warrant of Randall and Anderson's Gmail accounts, which were seized by law enforcement on November 16, 2023. These emails corroborate Mekail's and Anderson's statements regarding MAREIK's role in the Medi-Cal fraud scheme.

44. Emails between MAREIK and Randall show the two discussing and attaching the prescription order forms that were sent to Anderson to be used for the fraudulent prescriptions. Other emails show MAREIK as well as other patient marketers emailing Randall lists of beneficiary information (i.e., Medi-Cal ID #s, addresses, and DOBs), as well as lists with names of the Fraud Scheme Medications and changes made to certain patients' prescription orders.

45. There are over 500 emails between MAREIK and Anderson during the time period of March 2021 through November 14, 2023.

22

These communications largely consist of emails from MAREIK, on behalf of MHS, sending Anderson the above-described prescription forms for Medi-Cal beneficiaries, with pre-filled patient names, medications, quantities, and refills and dosages for the Fraud Scheme Medications.

46.    Some of the prescription forms that MAREIK emailed to Anderson contained prescription forms for MAREIK and her family members, as well as for Mekail's family members.

47.    In addition, there are emails from MAREIK requesting Anderson to fax patient sheets to Monte Vista, with Anderson confirming that she has sent the faxes.

48.    Email communications between MAREIK and Mekail show Mekail and MAREIK exchanging various iterations of the prescription templates, as well as name of medications.  In one email communication, Mekail emails MAREIK a list of patients who are "eligible" for Prenatrix prenatal vitamins, one of the Fraud Scheme Medications.  When asked about this email, Mekail stated he was sending MAREIK a list of only female Medi-Cal beneficiaries -- including individuals who were much younger than the expected child-bearing age -- without determining whether they were eligible for prenatal vitamins.  Mekail stated this email to MAREIK was in response to previously receiving prescriptions signed by Anderson prescribing prenatal vitamins for male patients.

49.    Email communications between MAREIK, Randall, and Anderson also discuss complaints from Medi-Cal beneficiaries who received the Fraud Scheme Medications despite not wanting or

23

needing the medications, and despite never being evaluated by Anderson.  In an email from Anderson to MAREIK to Randall referencing a complaint about unwanted medication and reporting Anderson to the Better Business Bureau dates February 6, 2023, MAREIK responds to Anderson directly, "I'm on it."

50.  A review of emails, FAXAGE, and Medi-Cal claims records shows that (1) MAREIK emailed Anderson prefilled prescription forms for the Fraud Scheme Medications; (2) Anderson added her e-signature to the prescriptions and then e-faxed them to Monte Vista using FAXAGE; and (3) Monte Vista billed Medi-Cal for purportedly dispensing the medication on or around the same day.

  a.    *Beneficiary K.R.*

51.  For example, I reviewed an email from MAREIK to Anderson dated October 11, 2022, with the subject line "8 patients" and enclosing prescription order forms for eight Medi-Cal beneficiaries, including for Medi-Cal beneficiary K.R. for the Fraud Scheme Medications:

24



| From: | Christina Mareik◄ ███████████ |
| Sent: | Tue 10/11/2022 4:18:16 AM (UTC) |
| To: | Nurse Pattye◄ ██████████ |
| Subject: | 8 patients |
| Attachment: | email_RX MEDICAL (A) NO SIGNATURE D███D████ .pdf.pdf |
| Attachment: | email_RX MEDICAL (A) NO SIGNATURE A███C███ .pdf.pdf |
| Attachment: | email_RX MEDICAL (A) NO SIGNATURE C███R, ████ .pdf.pdf |
| Attachment: | email_RX MEDICAL NO SIG A███S██L██ .pdf.pdf |
| Attachment: | email_RX MEDICAL (J) NO SIG W██████JI███ .pdf.pdf |
| Attachment: | email_RX MEDICAL (J) NO SIG F██████N███ .pdf.pdf |
| Attachment: | email_RX MEDICARE NO SIG T███G███ .pdf.pdf |
| Attachment: | email_RX MEDICAL NO SIG R██K███ .pdf.pdf |

Please see attached

52.   That same day, Anderson faxed a signed prescription to Monte Vista for patient K.R:



Phone Records

53.   I have reviewed text message communications from MAREIK's phone, which was seized by law enforcement on or around April 25, 2025 pursuant to a search warrant mentioned in paragraph 9, supra.

54.   The text message communications include texts between MAREIK and Randall, whereby MAREIK asks Randall for the driver's licenses and insurance information for patients and Randall exchanges lists of Medi-Cal beneficiaries, as well as copies of drivers' licenses and Medi-Cal identification cards for these individuals.  MAREIK also provides Randall with updates regarding patients' insurance and medication eligibility, and whether the patients are already in the system and have been processed.

55.   The text message communications also include texts between Randall and MAREIK discussing obtaining new patients and prescriptions orders for pharmacies before Medi-Cal resumed its prior authorization requirement for the Fraud Scheme Medications.

56.   The text message communications also include texts between MAREIK and Anderson on a near-daily basis, whereby MAREIK informs Anderson when she has sent over patients and prescription forms to Anderson.

57.   In other text communications, MAREIK texts Mekail the expected list of Medi-Cal patients for the day, as shown below:

26



58.    The text message communications also include texts from MAREIK asking Mekail to email her the list of return medications and wrong addresses for patients so she can call the patients. MAREIK's texts with Mekail also include photographs of patients' driver's licenses and insurance cards.

59.    In text communications between MAREIK and Mekail regarding patients, Mekail informs MAREIK about patients who are covered by Medicare and not by Medi-Cal, and MAREIK tells Mekail she will change the prescription.

60.    I have also reviewed text message communications from Randall's phones, which were seized by law enforcement on November 16, 2023, during the execution of search warrants on Randall's residence and Randall's person in November 2023.

61.    The text message exchanges between MAREIK and Randall include texts that I understand to be discussing MAREIK sending prescriptions to Anderson for her signature. Specifically, in an April 6, 2023, exchange, MAREIK texted Randall that "K I just sent 10 patients to Pattye [i.e., Anderson] to sign", to which Randall responded, "Great".

27

Medi-Cal Beneficiary Interviews

62.   Agents interviewed several Medi-Cal beneficiaries for whom Monte Vista billed for the Fraud Scheme Medications.  This group of individuals — including individuals who had submitted complaints to DHCS regarding Monte Vista — verified Monte Vista's fraudulent billing and dispensing of high-cost generic drugs.

a.    Beneficiary K.R.

63.   In May 2023, agents interviewed K.R., a 49-year-old Medi-Cal beneficiary, who stated the following:

a.    in October 2022, K.R.'s friend asked him if he would accept some medical samples.  At the time, K.R.'s friend had been working at what K.R. believed was a dental insurance company and K.R. thought the samples might be dental-related.  K.R.'s friend told him he would be paid $100 for every person he could get to participate in accepting the medical samples.  K.R. initially agreed to accept the samples to help out his friend, but K.R. was then informed that he was "not qualified" to accept the samples because his Veterans Affairs ("VA") health insurance conflicted with receiving medical samples.

b.    However, after K.R. initially agreed to accept the samples, he began to receive spam e-mails and a package in the mail containing ten medical pain patches.  The package label contained the name "Dr. Patricia Anderson" and various numbers.  When K.R. called the pharmacy to inquire about the package, the pharmacy employee informed K.R. that there were five medications

28

in their system that were listed as prescribed to him, and that insurance was going to be billed for the medications.

       c.    K.R. called the pharmacy several more times and was either put on hold or told that the pharmacy manager would call him back.  K.R. never spoke with or received a call back from the manager.  While K.R. could not recall the name of the pharmacy in Montclair at the time of the investigative team's interview, during a previous interview with the DHCS in January 2023 regarding this matter, K.R. provided DHCS with a prescription label of Synoflex, which listed Monte Vista Pharmacy, as well as "Patricia Anderson APRN" as the prescriber.

      64.    An example of a claim submitted by Monte Vista for one of the Fraud Scheme Medications prescribed by Anderson and purportedly dispensed to K.R. is shown below.  As discussed above in paragraphs 51-52, on October 11, 2022, MAREIK emailed Anderson a prescription form for K.R. for the below medication as well as several other Fraud Scheme Medications, which Anderson faxed to Monte Vista that same day.  Medi-Cal claims data shows that Monte Vista submitted claims for seven other Fraud Scheme Medications purportedly dispensed to K.R. the same day.  As noted above, K.R. stated he did not need any of the medication and did not know the prescriber Anderson:

| DATE | BENEF-ICIARY | CLAIM NO. | MEDICATION | PRESCRIBER | APPROX. BILLED AMOUNT |
|---|---|---|---|---|---|
| 10/11/22 | K.R. | 512504 79201 | Meloxicam 5 mg capsule | Anderson | $13,424.45 |

b.   *Beneficiary H.L.*

65.   Medi-Cal beneficiary H.L. was interviewed on July 10, 2023.  H.L. stated about a month after going to urgent care to get a cyst removed, he started receiving medication from Monte Vista Pharmacy sent to him by mail.  Most of the medication was creams such as Lidocaine.  H.L. did not need any of the medication and never used any of it.  H.L. had never heard of Anderson.

66.   Agents took photos of the medications sent to H.L. by Monte Vista Pharmacy, as shown in the photo below:



67.   A review of MAREIK's emails show MAREIK and Mekail exchanging lists of Medi-Cal patients for Monte Vista, including

30

H.L., in September and December 2022.  MAREIK also emails Anderson a prescription form for H.L. in December 2022.

68.  Monte Vista submitted the following claims to Medi-Cal for Fraud Scheme Medications allegedly dispensed to H.L. on September 16, 2022.

| DATE | CLAIM NO. | MEDICATION | PRESCRIBER | APPROX. BILLED AMOUNT |
|------|-----------|------------|------------|-----------------------|
| 9/16/22 | 59088043005 | Lidocort 3-0.5% Cream | Anderson | $4,142.79 |
| 9/16/22 | 59088043005 | Lidocort 3-0.5% Cream | Anderson | $4,142.79 |
| 9/16/22 | 59088046607 | Dermacinrx Lidogel 2.8% Gel | Anderson | $11,379.99 |
| 9/16/22 | 59088037107 | Lidotral 3.88% Cream | Anderson | $10,798.54 |
| 9/16/22 | 68180018806 | Meloxicam 5 Mg Capsule | Anderson | $13,424.45 |
| 9/16/22 | 70512001515 | Synoflex 4%-5% Patch | Anderson | $5,716.51 |
| 9/16/22 | 50991097730 | Folite Tablet | Anderson | $25,793.62 |
| 9/16/22 | 15370018060 | Lofena 25 Mg Tablet | Anderson | $8,371.31 |

Randall Pays MAREIK at least $279,000 Using Medi-Cal Fraud Scheme Proceeds

a.    *Monte Vista's Financial Transactions with Randall*

69.  As set forth below, bank records show that fraud proceeds were transferred from Monte Vista to the SOCAL Trust Accounts, which were established for the benefit of Randall, with K.J. named as the trustee.[5]

─────────────

[5] K.J. was interviewed in November 2023 and stated he had signatory authority over the SOCAL Trust Accounts and personally
(footnote cont'd on next page)

31

70.  Documents submitted to Wells Fargo Advisors identify K.J. as the signatory and the trustee of the SOCAL Trust Accounts.  In addition, K.J. submitted a document titled Trustee Certification of Investment Powers which identified "Richard Paul Randall" (which I submit refers to Randall) as the "grantor, settlor, or testator" who established SOCAL Trust on or about May 15, 2020.

71.  A business checking account ending in X5190 for Monte Vista was opened on September 8, 2022, at Wells Fargo Bank with Mekail as the sole signatory ("Monte Vista Account 1").[6]  Bank records show that Medi-Cal paid Monte Vista for fraudulent prescriptions billed to Medi-Cal by depositing funds into Monte Vista Account 1.

72.  A separate business checking account for Monte Vista (ending in X5458) was opened previously on May 5, 2021, at Bank of America with Mekail, his mother, and father as signors on the account ("Monte Vista Account 2").  Bank records show that Medi-Cal paid Monte Vista for fraudulent prescriptions billed to the Medi-Cal program by depositing funds into Monte Vista Account 2.

73.  Bank record analysis revealed that, beginning in May 2022, and continuing through January 2023, Mekail issued checks from Monte Vista Account 1 and Monte Vista Account 2 payable to SOCAL Trust totaling over $32 million, which were deposited into

---

signed checks and/or obtained cashier's checks for payments under the direction of Randall.

[6] Mekail's mother was added as a signor on November 10, 2022.

the SOCAL Trust Accounts.  The payments were largely in the form of checks with the memo line "consulting services."  The monies funding the payments from Monte Vista to the SOCAL Trust Accounts were derived from the fraudulent Medi-Cal billing scheme at Monte Vista.

> b.    *Randall's Payments to MAREIK from the SOCAL Trust Accounts*

74.  On or about March 30, 2020, MAREIK opened a Wells Fargo Bank checking account ending -9239 under the name Siena Management.  MAREIK was the sole signatory on the account.

75.  From March 2022 to December 2023, SOCAL Trust, using Fraud Scheme Proceeds, paid MAREIK approximately $253,000, in checks, cashier's checks and cash.

76.  In addition, according to Mekail, Randall instructed Monte Vista to issue checks totaling approximately $26,000 directly to MAREIK.

77.  In total, from March 2022 through December 2023, Randall, through SOCAL Trust, Monte Vista, and cash deposits, paid MAREIK at least approximately $279,000.

78.  A review of bank records reflected that Randall continued to pay MAREIK through his attorney A.G. following the seizure of his bank accounts in November 2023.  For example, from January 8, 2024, through September 9, 2024, A.G. issued six checks to MAREIK from his law firm, totaling $4,000.

## V.    CONCLUSION

79.  For all the reasons described above, there is probable cause to believe that in the Central District of California and

33

elsewhere, MAREIK, Randall, Mekail, Anderson, and others, did knowingly and willfully execute and willfully caused to be executed the scheme to defraud Medi-Cal described in this Affidavit by submitting and causing to be submitted false and fraudulent claims for prescription medications that were not medically necessary, not dispensed to Medi-Cal beneficiaries, and/or were procured by kickbacks, namely, MAREIK submitted and caused the submission of following false and fraudulent claim to Medi-Cal:

| DATE | BENEF-ICIARY | CLAIM NO. | MEDICATION | PRESCRIBER | APPROX. BILLED AMOUNT |
|---|---|---|---|---|---|
| 10/11/22 | K.R. | 512504 79201 | Meloxicam 5 mg capsule | Anderson | $13,424.45 |

80.    Thus, there is probable cause for the requested complaint and arrest warrant for MAREIK for committing a violation of 18 U.S.C. § 1347 (health care fraud).


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 12th day of June, 2026.

_____

HONORABLE ANNA Y. PARK
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 1

# UNITED STATES DISTRICT COURT

for the

Central District of California

In the Matter of the Search of:

The cellular telephone associated with the telephone number ▮▮▮▮▮▮▮, as described in Attachment A-2

)
)
)
)
)
)
)
)

Case No. 2:25-mj- 2262

## APPLICATION FOR WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer, request a warrant pursuant and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A-2*

There are now concealed or contained the items described below:

*See Attachment B-2*

The basis for the search is:

☑ Evidence of a crime;
☐ Contraband, fruits of crime, or other items illegally possessed;
☑ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

18 U.S.C. § 1349 (Conspiracy to commit health care fraud and wire fraud); 18 U.S.C § 1347 (Health Care Fraud); 18 U.S.C. § 371 (Conspiracy to Defraud the United States and Pay and Receive Health Care Kickbacks); 18 U.S.C. § 1343 (Wire Fraud); 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering); 18 U.S.C. § 1956(a)(1)(B) (Concealment Money Laundering); 18 U.S.C. § 1957 (Engaging in Monetary Transactions in Property Derived From Specified Unlawful Activity); 42 U.S.C. § 1320a-7b (Health Care Kickbacks)

The application is based on these facts:

*See attached Affidavit*

|  |
|---|
| *Applicant's signature* |
| Elaine Wong, FBI Special Agent |
| *Printed name and title* |

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  April 17, 2025

City and State:  ___Los Angeles, CA___

AUSA: DOJ Trial Attorney Siobhan Namazi (202)▮▮▮▮▮

*Judge's signature*

Karen L. Stevenson, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-2

### PROPERTY TO BE SEARCHED

The property to be searched consists of the cellular telephone associated with the telephone number ███████████ (the "Subject Telephone Number").

**ATTACHMENT B-2**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 1349 (conspiracy to commit health care fraud and wire fraud), 18 U.S.C. § 1347 (health care fraud), 18 U.S.C. § 371 (conspiracy to defraud the United States and pay and receive health care kickbacks), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1956(h) (conspiracy to commit money laundering), 18 U.S.C. § 1956(a)(1)(B) (concealment money laundering), 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity), and 42 U.S.C. § 1320a-7b(b) (health care kickbacks) (collectively, the "Subject Offenses") and occurring between October 1, 2021, and December 31, 2023, namely:

a.   Records or communications related to the prescribing of medications dispensed by pharmacies, including Monte VP LLC dba Monte Vista Pharmacy ("MONTE VISTA").

b.   Records or communications related to the submission of claims for prescription medications to a health care benefit program, including Medicaid of California ("Medi-Cal").

c.   Records or communications related to offering, paying, soliciting, or receiving payments for prescribing medications for Medi-Cal beneficiaries, including but not limited to invoices, checks, ledgers, statements, and deposit tickets.

1

        d.    Records or communications related to offering, paying, soliciting, or receiving payments to individuals, including marketers, for the referral of patients, including Medi-Cal beneficiaries.

        e.    Records or communications relating to the referral of patients, including Medi-Cal beneficiaries, for the prescription of medications.

        f.    Records and materials related to payments to or from the following entities and individuals: Christina Hernandez, also known as ("aka") Christina Sanchez Hernandez, aka Christina Mareik ("Hernandez"), MONTE VISTA, Kyrollos Mekail ("Mekail"), SOCAL Family Irrevocable Investment Trust ("SoCal Trust"), Paul Randall ("Randall"), A██████ G██████ ("G██████"), MHS LLC ("MHS"), K██████ J██████ J██████ RPI Escrow Account, Siena Management Group ("Siena Management"), and Patricia Anderson ("Anderson").

        g.    Records and communications relating to Medi-Cal beneficiary patient records, including, but not limited to, any medical documentation, paper prescriptions, digital prescriptions, certificates of medical necessity, invoices, claims submitted to Medi-Cal, and any other medical documentation.

        h.    Records and materials related to the identity of individuals receiving medication from pharmacies, including, but not limited to, any patient lists or correspondence, emails, communications, or messages to or from patients or physicians.

2

i.    Records and communications related to correspondence between MONTE VISTA, Mekail, Randall, Hernandez, or Anderson and Medi-Cal.

j.    Records or communications related to correspondence between MONTE VISTA, Mekail, Anderson, Hernandez, or Randall and Medi-Cal beneficiaries.

k.    Records or communications related to an audit of MONTE VISTA by the California Department of Health Care Services ("DHCS").

l.    Records and materials related to billing or the submission of claims for reimbursement to a health care benefit program, including to Medi-Cal and Medicare.

m.    Records and materials related to communications between MONTE VISTA, Anderson, Randall, Hernandez, Siena Management, MHS, or its employees, regarding Medi-Cal beneficiaries or reimbursement.

n.    Records and materials related to the processing and filling of prescriptions for patients, including Medi-Cal beneficiaries.

o.    Business agreements and contracts involving Hernandez, Siena Management, Mekail, G█████, Randall, K██████ J███████, Anderson, or MHS.

p.    Calendars, appointment books, telephone message pads, day planners, logs, correspondence, rolodexes, emails, and address books.

3

2.    Any digital device which is itself or which contains evidence, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

3.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

b.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the attachment of other devices;

d.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.    evidence of the times the device was used;

f.    applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

g.    records of or information about Internet Protocol addresses used by the device.

4.    As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

5.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.    SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION

6.    The following procedures will be followed at the time of the search in order to avoid unnecessary disclosures of any privileged attorney-client communications or work product:

5

Digital Evidence

7.    Law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search (the "Search Team") will conduct the search of any digital device capable of being used to facilitate the Subject Offenses or capable of containing data falling within the scope of the items to be seized.  The "Privilege Review Team" (previously designated individual(s) not participating in the investigation of the case) will then review the identified digital device data as set forth herein.  The Search Team will review only digital device data which has been released by the Privilege Review Team.

8.    The Privilege Review Team will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.

9.    The Privilege Review Team and the Search Team shall complete both stages of the search discussed herein as soon as is practicable but not to exceed one year from the date of execution of the warrant.  The government will not search the digital device(s) beyond this one year period without obtaining an extension of time order from the Court.

10.    The Search Team will provide the Privilege Review Team with a list of "privilege key words" to search for on the digital devices, to include specific words like "A▮▮▮▮ G▮▮▮▮" and "G▮▮▮▮ & Associates LLP" and their e-mail addresses and phone numbers, and generic words such as "privileged" and "work

6

product."  The Privilege Review Team will conduct an initial
review of the data on the digital devices using the privilege
key words, and by using search protocols specifically chosen to
identify documents or data that appear to contain or refer to
communications between A▮▮▮▮ G▮▮▮▮, or to contain the work
precut of A▮▮▮▮ G▮▮▮, and any person ("potentially
privileged information").  The Privilege Review Team may subject
to this initial review all of the data contained in each digital
device capable of containing any of the items to be seized.
Documents or data that are identified by this initial review as
not potentially privileged may be given to the Search Team.

11.  Documents or data that the initial review identifies
as potentially privileged will be reviewed by a Privilege Review
Team member to confirm that they contain potentially privileged
information.  Documents or data that are determined by this
review not to be potentially privileged may be given to the
Search Team.  Documents or data that are determined by this
review to be potentially privileged will be given to the United
States Attorney's Office or Criminal Division, Fraud Section for
further review by a Privilege Review Team Attorney ("PRT
Attorney").  Documents or data identified by the PRT Attorney
after review as not potentially privileged may be given to the
Search Team.  If, after review, the PRT Attorney determines it
to be appropriate, the PRT Attorney may apply to the court for a
finding with respect to particular documents or data that no
privilege, or an exception to the privilege, applies.  Documents
or data that are the subject of such a finding may be given to

7

the Search Team.  Documents or data identified by the PRT Attorney after review as privileged will be maintained under seal by the investigating agency without further review absent subsequent authorization.

12.  The Search Team will search only the documents and data that the Privilege Review Team provides to the Search Team at any step listed above in order to locate documents and data that are within the scope of the search warrant.  The Search Team does not have to wait until the entire privilege review is concluded to begin its review for documents and data within the scope of the search warrant.  The Privilege Review Team may also conduct the search for documents and data within the scope of the search warrant if that is more efficient.

13.  In performing the reviews, both the Privilege Review Team and the Search Team may:

a.  search for and attempt to recover deleted, "hidden," or encrypted data;

b.  use tools to exclude normal operating system files and standard third-party software that do not need to be searched; and

c.  use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

14.  Neither the Privilege Review Team nor the Investigation Team will seize contraband or evidence relating to other crimes outside the scope of the items to be seized without

8

first obtaining a further warrant to search for and seize such contraband or evidence.

15.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

16.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

17.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain forensic copies of the digital device but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

18.  The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

19.  After the completion of the search of the digital devices, the government shall not access digital data falling

9

outside the scope of the items to be seized absent further order of the Court.

20.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

21.   During the execution of this search warrant, law enforcement is permitted to: (1) depress Hernandez's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of Hernandez's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

22.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices

10

pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## Table of Contents

I.   INTRODUCTION ......................................... 1

II.  PURPOSE OF AFFIDAVIT ................................. 2

III. ITEMS TO BE SEIZED .................................. 3

IV.  SUMMARY OF PROBABLE CAUSE ........................... 3

V.   STATEMENT OF PROBABLE CAUSE ......................... 6

     A.   ████████████████████████████ .................. 6

     B.   ████████████████████████████ .................. 9

     C.   ANDERSON Email Evidence ...................... 10

     D.   RANDALL Phone Evidence ....................... 11

     E.   ANDERSON Phone Evidence ...................... 13

     F.   Bank Record Analysis ......................... 13

     G.   HERNANDEZ's Person and Evidence Related to HERNANDEZ's Phone ..................................... 14

VI.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES ......... 16

VII. CONCLUSION ......................................... 19

## **AFFIDAVIT**

I, Elaine M. Wong, being duly sworn, hereby declare and state as follows:

### I.   **INTRODUCTION**

1.   I am a Special Agent with the FBI and have been so employed since February 2013.  I am currently assigned to a white-collar crime squad, Los Angeles Field Office, West Covina Resident Agency, which is responsible for investigating complex financial crimes, including health care fraud.

2.   Since becoming an FBI Special Agent, I received 22 weeks of formal training at the FBI Training Academy in Quantico, Virginia, as well as additional training courses related to criminal and counterintelligence investigations.  In addition, I have received training in financial analysis and identification of fraudulent financial activity both in Quantico and elsewhere.  During my time with the FBI, I have participated in numerous investigations regarding health care fraud.  I have participated in many aspects of criminal investigations, including reviewing evidence, conducting physical surveillance, and the execution of search, arrest, and seizure warrants.  Additionally, I have interviewed witnesses and victims who had personal knowledge regarding the investigations in which I have been involved.

3.   I am investigating this case with other law enforcement officers, including Special Agents John Stewart and Jim Nguyen with the United States Department of Health and Human Services, Office of Inspector General ("HHS-OIG"), and Special

1

Agent Khanhvan Le with the California Department of Justice. The facts set forth in this affidavit are based upon my personal observations, my training and experience, the review of documents and records that were collected during this investigation, information that was obtained from interviewed witnesses, and information obtained and relayed to me by Special Agents Stewart, Nguyen, and Le, other members of the investigative team, and others as described below.

4.    Because this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included every detail of every aspect of the investigation. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part.  In addition, the events described in this affidavit occurred on or about the dates provided herein.  Where figures, calculations, dates, and times are reported herein, they are approximate.

## II.   **PURPOSE OF AFFIDAVIT**

5.    This affidavit is made in support of an application for search warrants for: (1) the person of CHRISTINA HERNANDEZ, also known as ("aka") "Christina Sanchez Hernandez," aka "Christina Mareik" ("HERNANDEZ") as described in more detail below, in Attachment A-1 (the "SUBJECT PERSON"); and (2) a cellular telephone associated with the telephone number ███████ ███ (the "Subject Telephone Number"), as described in more detail below, in Attachment A-2 (the "SUBJECT DEVICE").

2

Attachments A-1, A-2, B-1, and B-2 are incorporated herein by reference.

### III. ITEMS TO BE SEIZED

6.    The items to be seized are the fruits, evidence, and instrumentalities of violations of 18 U.S.C. § 1349 (conspiracy to commit health care fraud and wire fraud), 18 U.S.C. § 1347 (health care fraud), 18 U.S.C. § 371 (conspiracy to defraud the United States and pay and receive health care kickbacks), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1956(h) (conspiracy to commit money laundering), 18 U.S.C. § 1956(a)(1)(B) (concealment money laundering), 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity), and 42 U.S.C. § 1320a-7b(b) (health care kickbacks) (collectively, the "Subject Offenses"), as described in Attachments B-1 and B-2, which are incorporated herein by reference.

### IV. SUMMARY OF PROBABLE CAUSE

7.    This investigation is focused on a health care fraud scheme involving KYROLLOS MEKAIL ("MEKAIL"), PAUL RANDALL ("RANDALL"), PATRICIA ANDERSON ("ANDERSON"), A█████ G█████ ("G█████"), HERNANDEZ, and others who caused the submission of approximately $306 million in false claims in just 11 months to Medicaid of California ("Medi-Cal") through MONTE VISTA for expensive prescription drugs containing generic ingredients (the "Fraud Scheme Medications") that were not medically necessary and, in many instances, not provided to the beneficiaries.

3

8.    On or about November 14 and 15, 2023, the Honorable Patricia Donahue issued search warrants, including for the business location of Monte VP LLC, doing business as Monte Vista Pharmacy ("MONTE VISTA"), the email accounts of ANDERSON and RANDALL, the residence of RANDALL, and the person of RANDALL. See 2:23-MJ-5835 (for MONTE VISTA), 2:23-MJ-5841 (for ANDERSON's and RANDALL's email accounts), 2:23-MJ-05837 (for RANDALL's residence), and 2:23-MJ-5839 (for RANDALL's person).  In support of the search warrant application for MONTE VISTA, I provided an affidavit, attached hereto as **Exhibit 1**, hereby incorporated, which detailed the health care fraud scheme.

9.    The affidavit described how over 99 percent of the drugs billed to Medi-Cal by MONTE VISTA were prescribed by ANDERSON.  In a proffer interview, ANDERSON stated that she worked for a company owned by RANDALL and G██████ called MHS LLC ("MHS"), where she was paid to sign off on "refills" for prescriptions that were sent to MONTE VISTA, without ever seeing the patients or their medical charts.  Bank records show that RANDALL, through G█████, paid ANDERSON over $275,000 from July 2022 through April 2023.  ANDERSON also stated that HERNANDEZ was RANDALL's assistant at MHS, and that HERNANDEZ would send ANDERSON names of patients for which ANDERSON was to sign off on prescriptions.  In a proffer interview, MEKAIL stated he received faxed prescriptions for the Fraud Scheme Medications from HERNANDEZ, whom he described as RANDALL's business manager. MEKAIL stated that HERNANDEZ sent MEKAIL the prescriptions on behalf of MHS, and that MEKAIL would contact HERNANDEZ at the

4

Subject Telephone Number with any issues relating to the prescriptions.

10. On or about August 20, 2024, the Honorable Maria A. Audero issued a search warrant for information associated with the Google account christinamareik@gmail.com ("HERNANDEZ's Gmail account").[1] Email records for HERNANDEZ's Gmail account included numerous emails from HERNANDEZ to ANDERSON attaching blank template prescriptions for Fraud Scheme Medications for numerous patients. The emails also included emails where ANDERSON emailed to HERNANDEZ an invoice that included a $200 charge per patient prescription.

11. Review of a phone seized during the search of RANDALL's residence included numerous text exchanges between RANDALL and HERNANDEZ using the Subject Telephone Number. These exchanges included discussions of RANDALL needing to refer certain numbers of patients to particular pharmacies, RANDALL meeting with ANDERSON, and HERNANDEZ sending "patients to Pattye [i.e., ANDERSON] to sign."

12. AT&T subscriber records show that HERNANDEZ is the subscriber to the Subject Telephone Number.

13. AT&T records show that during the period of May 2022 to January 2024, there were approximately 17,876 calls between phone numbers believed to belong to RANDALL and the Subject

---

[1] From bank records, phone records, and records seized from HERNANDEZ's Gmail account, I understand that "CHRISTINA MAREIK" is another identifier used by HERNANDEZ.

Telephone Number, and approximately 392 calls between a phone number associated with MEKAIL and the Subject Telephone Number.

14.  Bank records show that RANDALL, through one of the bank accounts in the name of SOCAL Family Irrevocable Investment Trust ("SOCAL TRUST") described further in **Exhibit 1**, paid a bank account under HERNANDEZ's name approximately $253,000.

15.  In their respective proffer interviews, ANDERSON and MEKAIL identified the Subject Telephone Number as HERNANDEZ's telephone number.  I have reviewed text messages and emails from ANDERSON to others involved in the health care fraud scheme, including MEKAIL and RANDALL, which reference ANDERSON's communications with HERNANDEZ.  There is probable cause that evidence, fruits, and instrumentalities of this fraud scheme will be found on the SUBJECT PERSON and in the SUBJECT DEVICE.

## V.    STATEMENT OF PROBABLE CAUSE

A.    █████████████████████████

16.    █████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████    ████████████████  █

████████████████████████████████████████

████████████████████████████████████

████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████



7

17.    Previously, on April 8, 2024, ANDERSON, accompanied by her counsel, was interviewed.[7]  In the interview, ANDERSON stated that she worked for MHS; that her contact at MHS was RANDALL; that her job at MHS was to prescribe refills for patients billed through MONTE VISTA without seeing the patient or a patient chart, and that she was paid $25,000 a month for her work. ANDERSON stated that HERNANDEZ, who worked for RANDALL at MHS, would send ANDERSON prescription sheets containing patient names and medications via email from HERNANDEZ's Gmail account for ANDERSON to sign and send back to HERNANDEZ, and that these prescription sheets were then submitted to MONTE VISTA.

18.    ANDERSON identified the Subject Telephone Number as HERNANDEZ's telephone number.  Toll records from AT&T show that from May 2022 to January 2024 — which includes the period of the

Medi-Cal Fraud Scheme — there were approximately 17,876 calls between phone numbers believed to belong to RANDALL and the Subject Telephone Number.

**B.** █████████████████████████████████████

19.  ███████████████████████████████████████████



20.  Previously, on March 14, 2024, MEKAIL, accompanied by counsel, was interviewed.[9]  MEKAIL stated that HERNDANDEZ was RANDALL's business manager, that beginning in approximately May 2022, he received prescriptions via fax from HERNANDEZ, and by December 2022, received up to 40 prescriptions per day.  RANDALL

_____

████████████████████████████████████████

told MEKAIL to contact HERNANDEZ with any issues about the prescriptions.

21.  MEKAIL identified the Subject Telephone Number as HERNANDEZ's telephone number.  Toll records from AT&T show that from May 2022 to January 2024 — which includes the period of the Medi-Cal fraud scheme — there were approximately 392 calls between a phone number associated with MEKAIL and the Subject Telephone Number.

## C.    ANDERSON Email Evidence

22.  I have reviewed emails from ANDERSON's Gmail account, which were seized by law enforcement on November 16, 2023, pursuant to a search warrant mentioned in paragraph 8, supra. The emails contain over 500 email communications between ANDERSON and HERNANDEZ, using the email account christinamareik@gmail.com from March 2021 through November 14, 2023, which includes the period of the Medi-Cal Fraud Scheme. During her interview, ANDERSON identified the HERNANDEZ's Gmail account as the email address used by HERNANDEZ to communicate with her.

23.  The email communications include emails from HERNANDEZ to ANDERSON attaching prescription "sheets" containing patient names and dosages of certain medications, including the Fraud Scheme Medications, which is consistent with what ANDERSON described during her interview.  During her April 8, 2024, interview, ANDERSON confirmed that while ANDERSON worked for MHS, HERNANDEZ sent ANDERSON prescription sheets for ANDERSON to sign, including prescription sheets for the Fraud Scheme

10

Medications, and that ANDERSON signed and returned the prescription sheets to HERNANDEZ, who in turn sent them to MONTE VISTA.

24.    The email communications also include invoices emailed from ANDERSON to HERNANDEZ and RANDALL, charging $200 per patient for "refills".  The invoices are addressed to MHS. Based on my review of bank records in this investigation, and as explained further in **Exhibit 1**, I know that MHS paid ANDERSON using illicit proceeds of the Medi-Cal fraud scheme, including payments that were transferred from MONTE VISTA to an account under the name SOCAL TRUST, which is an account set up for the benefit of RANDALL, and then subsequently transferred to ANDERSON, including via G███████.

25.    The email communications from ANDERSON to HERNANDEZ also reference HERNANDEZ sending text messages to ANDERSON about new patients.  For example, in an email chain between HERNANDEZ and ANDERSON dated January 17, 2023, HERNANDEZ emails ANDERSON prescription "sheets" for 26 patients, and ANDERSON responds, "I'm just now seeing these two emails.  Normally you send a text, but I happened to log on to see if I have any messages and saw them."

D.    **RANDALL Phone Evidence**

26.    I have also reviewed text message exchanges from RANDALL's phones, which were seized by law enforcement on November 16, 2023, during the execution of search warrants on RANDALL's residence and RANDALL's person mentioned in paragraph 8, supra.  The text message exchanges include texts between

11

RANDALL and HERNANDEZ, using the Subject Telephone Number, whereby the RANDALL and HERNANDEZ exchange lists of Medi-Cal patients, as well as copies of drivers' licenses and Medi-Cal identification cards for these patients.  The text message communications also include texts between HERNANDEZ and RANDALL discussing obtaining new patients and prescriptions orders for pharmacies before Medi-Cal resumed its prior authorization requirement for the Fraud Scheme Medications.

27.  The text message exchanges also include texts discussing RANDALL needing to refer certain numbers of patients to particular pharmacies.

28.  The text message exchanges also included texts that I understand to be discussing RANDALL meeting with ANDERSON. Specifically, in a May 26, 2023 exchange, HERNANDEZ texted RANDALL, "Am I meeting you after you meet up with Pattye so [] tomorrow".

29.  The text message exchanges also include texts that I understand to be discussing HERNANDEZ sending prescriptions to ANDERSON for her signature.  Specifically, in an April 6, 2023 exchange, HERNANDEZ texted RANDALL that "K I just sent 10 patients to Pattye [i.e., ANDERSON] to sign", to which RANDALL responded, "Great".

30.  I have also reviewed email communications from RANDALL's email account, which was seized by law enforcement on November 16, 2023, pursuant to a search warrant mentioned in paragraph 8, supra.  The email communications include emails from HERNANDEZ to RANDALL enclosing lists of Medi-Cal patients,

12

along with their dates of birth and Medi-Cal identification numbers, that HERNANDEZ obtained from patient marketers. The email communications between HERNANDEZ and RANDALL also discuss complaints from Medi-Cal beneficiaries who received the Fraud Scheme Medications despite not wanting or needing the medications, and despite never being evaluated by ANDERSON.

**E.    ANDERSON Phone Evidence**

31. I have also reviewed images of select text messages produced by ANDERSON's attorney. The images of the text messages include communications between ANDERSON and RANDALL. The text messages I reviewed appear to be in the date range of May 2022 through at least December 2023, which includes the date range of the Medi-Cal fraud scheme. The text messages include discussions between RANDALL and ANDERSON about what I understand to be HERNANDEZ sending prescription sheets to ANDERSON for ANDERSON to sign, as well as reference to communications between HERNANDEZ and ANDERSON about payment. For example, in one text message, dated June 9, 2022, RANDALL tells ANDERSON that "Christina [i.e., HERNANDEZ] trying to reach you about invoice."

**F.    Bank Record Analysis**

32. Bank records show that HERNANDEZ is the signatory on a Wells Fargo bank account in the name of SIENA MANAGEMENT GROUP ("SIENA MANAGEMENT") that received approximately $115,000 from an account in the name of SOCAL TRUST, $138,000 from an account in the name of K██████ J████████,[10] $26,000 from MONTE VISTA, and

---

[10] In a November 6, 2023 interview, J████████ stated that he
*(footnote continued on next page)*

13

$116,725 in cash deposits.  HERNANDEZ also deposited approximately $8,400 in cash into a Wells Fargo bank account in her name.

G.    **HERNANDEZ's Person and Evidence Related to HERNANDEZ's Phone**

33.    I have reviewed a picture of HERNANDEZ based on her California Department of Motor Vehicle photo which is included in Attachment A-1.  HERNANDEZ is described as 5'1" tall with brown hair and brown eyes according to her California DMV records.

34.    Based on my training and experience, I know that individuals involved in illegal activities such as the Subject Offenses commonly use digital devices, including cellular telephones, to further their illegal schemes and communicate with associates.

35.    Because of the ability to store data on removable digital media, as well as cloud-based Internet storage, information such as text communications can readily be transferred between different digital devices, such as between smartphones.

36.    Cellular telephones are presently one of the most commonly used forms of communication.  People regularly carry a cellular telephone on their person at all times in order to

---

acted as the trustee of RANDALL's trust, SOCAL TRUST, managed the trust's bank accounts, and withdrew money and wrote checks from the trust's accounts at RANDALL's direction.  J████ stated that all payments he made to ANDERSON were at RANDALL's direction.

14

communicate with others, navigate, or perform internet searches, among other uses.  For these reasons and based on the facts detailed elsewhere in this affidavit, I believe HERNANDEZ likely carries her cellular telephone on her person and that her cellular telephone likely contains evidence pertaining to the government's investigation of illegal activities such as the Subject Offenses.

37.  Subscriber records from AT&T for the Subject Telephone Number list the user as "CHRISTINA M MAREIK," the financially responsible party and the billing party as "CHRISTINA M HERNANDEZ," and the billing address as ██████████████ ██ , Los Angeles, CA 90036.  This is the same address as listed as the residence for HERNANDEZ in her California DMV records.  Therefore, I believe that the SUBJECT DEVICE will be found within the Central District of California.

38.  According to records obtained from AT&T, the Subject Telephone Number was at one time associated with an Apple iPhone 11 Pro Max and International Mobile Equipment Identifier ████████████ .

39.  Based on the information set forth above, I believe that evidence, fruits, and instrumentalities of crime, as detailed herein and in Attachments B-1 and B-2 will be found on the SUBJECT PERSON and in the SUBJECT DEVICE.

15

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[11]

40.   As used herein, the term "digital device" includes the SUBJECT DEVICE associated with the Subject Telephone Number.

41.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files, or remnants of such files, months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been

---

[11] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

42. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data

17

in the field or outside of a controlled environment for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

43.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a

18

user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the device likely to be found in the search.

c.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress HERNANDEZ's thumb and/or fingers on the device; and (2) hold the device in front of HERNANDEZ's face with her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

44.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII.  <u>CONCLUSION</u>

45.  For all the reasons described above, I respectfully submit there is probable cause to believe that evidence of violations of 18 U.S.C. § 1349 (conspiracy to commit health care

19

fraud and wire fraud), 18 U.S.C. § 1347 (health care fraud), 18 U.S.C. § 371 (conspiracy to defraud the United States and pay and receive health care kickbacks), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1956(h) (conspiracy to commit money laundering), 18 U.S.C. § 1956(a)(1)(B) (concealment money laundering), 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity), and 42 U.S.C. § 1320a-7b(b) (health care kickbacks), as described above and in Attachments B-1 and B-2 of this affidavit, will be found in a search of the SUBJECT PERSON and the SUBJECT DEVICE as further described above and in Attachments A-1 and A-2, respectively.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 17th day of April, 2025.

_____
HONORABLE KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE

20